RYAN E. STEARNS, State Bar No. 165262
rstearns@stearnsandryan.com
STEARNS & RYAN, LAWYERS
21250 Hawthorne Boulevard, Suite 310
Torrance, CA 90503
Phone:        (310) 793-9570
Fax:          (310) 793-9575

Arielle Stephenson, State Bar No. 336434
Ellen Boyd, State Bar No. 339542
MITCHELL SANDLER PLLC
2020 K Street NW, Suite 760
Washington, D.C. 20006
202.886.5260
astephenson@mitchellsandler.com
eboyd@mitchellsandler.com

*Attorneys for Plaintiff West Capital Lending, Inc.*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WEST CAPITAL LENDING, INC., <br><br> Plaintiff, <br><br> vs. <br><br> LOANDEPOT.COM, LLC, <br><br> Defendant. | Civil Action No. <br><br><br> **COMPLAINT AND JURY DEMAND** |

        This is a complaint brought by West Capital Lending, Inc. ("West Capital")

against Defendant loanDepot.com, LLC ("Defendant" or "loanDepot"), and in

support states the following:

COMPLAINT AND JURY DEMAND
- 1 -

## NATURE OF THE ACTION

1.      loanDepot has engaged in a coordinated set of unlawful and unfair business practices in its Consumer Direct division that are stifling competition in the residential mortgage market, harming consumers in that market, and inflicting immediate and ongoing injury on other lenders, including West Capital, through loss of market share and customers.

2.      Pursuant to California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. ("UCL"), loanDepot is prohibited from engaging in unlawful, unfair or fraudulent business acts or practices.

3.      In direct violation of UCL, loanDepot has been engaging in a years-long unlawful and unfair pattern and practice of systematically violating the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 et seq., as implemented by Regulation Z, 12 C.F.R. Part 1026, by creating prohibited incentives that link the compensation paid to its production staff in its Consumer Direct Division to the terms of loans offered to its consumers. This unlawful compensation scheme injures consumers by allowing loanDepot to pay more money to its production staff if they are able to convince borrowers to move forward with loans with higher interest rates and fees. It also harms other lenders such as West Capital, who are not allowed to raise prices on some consumers and drop prices on other consumers when necessary. Excess profits received on some loans combined with the ability to offset discounts by

reducing compensation to employees provides loanDepot competitive advantages over other lenders, who were only able to incentivize the volume of loans sold, meaning there was: (i) no incentive for other lenders such as West Capital to offer anything but the lowest price to consumers up-front; and (ii) no ability for other lenders such as West Capital to offset discounts in loan terms with reductions in pay to production staff.  This provided loanDepot the unlawful and unfair ability to price loans higher upfront to maximize profits and greater flexibility when competing against other lenders.

## THE PARTIES

4.     Plaintiff West Capital is a direct-to-consumer lender licensed in California with its principal place of business located in Orange County, California. It maintains a similar business model to loanDepot's Consumer Direct Division, contacting consumers through a variety of advertising and marketing means and maintaining call centers to originate loans sourced through the marketing and advertising efforts.

5.     loanDepot.com, LLC is a Delaware limited liability company whose principal place of business is located at 6561 Irvine Center Dr., Irvine, CA 92618, in Orange County, California. It operates both a retail loan origination channel and a Consumer Direct lending channel. While both lending divisions are part of

loanDepot, their business models are different. This action involves loanDepot's Consumer Direct lending channel.

### JURISDICTION AND VENUE

6. This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. More specifically, this action involves a substantial disputed question of federal law under the Truth in Lending Act, 15 U.S.C. § 1601 et seq. Thus, while Plaintiff's cause of action is brought under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq., the federal question is essential to Plaintiff's claim, and its resolution implicates significant federal regulatory interests in the mortgage lending industry. *See Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005).

7. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District, conducts substantial business in California, and the claims arise out of, and relate to, Defendant's conduct directed to, and occurring in, this District.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

# FACTUAL ALLEGATIONS

9.    TILA prohibits loanDepot from linking employee compensation of those directly involved in the sale of mortgage loans to the interest rates or fees charged to consumers. Specifically, TILA provides:

> For any residential mortgage loan, no mortgage originator shall receive from any person and no person shall pay to a mortgage originator, directly or indirectly, compensation that varies based on the terms of the loan (other than the amount of the principal).

15 U.S.C. § 1639b(c)(1) (hereinafter referred to as the "Loan Officer Compensation Rule" or "LO Comp Rule").

10.    The LO Comp Rule applies to both loanDepot's loan officers and mid-level managers called "Production Managers" (together "Production Staff"). Specifically, the LO Comp Rule applies to any person who "takes an application, offers, arranges, assists a consumer in obtaining or applying to obtain, negotiates, or otherwise obtains or makes an extension of consumer credit for another person." 12 C.F.R. § 1026.36(a)(1)(i). Indeed, any employee of a creditor who, "advis[es] on particular credit terms that are or may be available to [a] consumer based on the consumer's financial characteristics" engages in origination, as does an employee "presenting particular credit terms for the consumer's consideration that are selected based on the consumer's financial characteristics, or communicating with a consumer for the purpose of reaching a mutual understanding about prospective credit terms." *See* 12 C.F.R. § 1026.36 cmt. 36(a)(1)(i)(A)(3) and (4).

11.    As such, employees that manage but remain engaged in negotiating credit terms, assisting in the application process, approving loan terms, or discussing loan terms upon the extension of credit are subject to the LO Comp Rule and may not be compensated based on the profitability of loans closed by them or by those they supervise:

> The definition of loan originator includes persons, including managers, who are employed by a creditor or loan originator organization and take an application, offer, arrange, assist a consumer with obtaining or applying to obtain, negotiate, or otherwise obtain or make a particular extension of credit for another person, even if such persons are also employed by the creditor or loan originator organization to perform duties that are not loan origination activities. Thus, such producing managers are loan originators.

12 C.F.R. § 1026.36 cmt. 36(a)(4)(v).

12.    loanDepot systematically violated this rule on a company-wide basis by directing its Production Managers to steer consumers into loanDepot's maximally priced, profit-optimized loans, and cutting compensation for any Production Manager who failed to do so.

13.    loanDepot's unlawful compensation scheme is memorialized in its official "Production Manager Compensation Plan" (the "Plan"), a copy of which is attached hereto as Exhibit A.  Specifically, the Plan provides that Production Managers earn monthly incentive compensation–above their base salary–based upon the terms of the loans they close directly or through their subordinate loan officers. *See id*. at 1-2.  This monthly incentive compensation is called the "Team

Bonus." *Id.* at 2.  Importantly, each Production Manager's "Team Bonus" is made up of a series of calculations, which include "Pricing Exceptions" ("PE")–defined as, "[a] reduced price offered to the customer that is less than the base price in our system." *Id.* By linking a Production Manager's Team Bonus to Pricing Exceptions," loanDepot is–by definition–violating TILA on a system-wide basis.

14.    TILA's regulatory framework further establishes the illegality of loanDepot's compensation scheme:

> In connection with a consumer credit transaction secured by a dwelling, a loan originator shall not direct or "steer" a consumer to consummate a transaction based on the fact that the originator will receive greater compensation from the creditor in that transaction than in other transactions the originator offered or could have offered to the consumer, unless the consummated transaction is in the consumer's interest.

12 C.F.R. § 1026.36(e)(1).

15.    The bar on term linked compensation applies not only to the loans directly originated by individual production staff, but to all loans originated collectively by teams of individuals performing loan origination activities:

> [I]n connection with a consumer credit transaction secured by a dwelling, no loan originator shall receive and no person shall pay to a loan originator, directly or indirectly, compensation in an amount that is based on a term of a transaction, the terms of multiple transactions by an individual loan originator, or the terms of multiple transactions by multiple individual loan originators.

12 C.F.R. § 1026.36(d)(1)(i).

16.    According to Regulation Z's official comments, if "the objective facts and circumstances indicat[e] that compensation would have been different if a transaction term had been different[,]" then there is a violation of the LO Comp Rule.  *See* 12 C.F.R. § 1026.36 cmt. 36(d)(1)(i).

17.    The purpose of the LO Comp Rule is to eliminate a situation in which the production staff engaged in selling the loans have "a financial incentive to 'steer' consumers into the highest interest rate possible or to impose on the consumer additional upfront charges payable to the creditor." *See* Bureau of Consumer Financial Protection ("CFPB"), *Loan Originator Compensation Requirements Under the Truth in Lending Act (Regulation Z) Final rules; official interpretations*, 78 Fed. Reg. 11280, 11286 (Feb. 15, 2013).

18.    The CFPB has also made clear that TILA's prohibitions cannot be circumvented by creating "Team-Based" compensation plans similar to loanDepot's Plan, which increases Production Manager compensation based upon the loans that are closed in the name of subordinate loan officers who work on their team:

> profit-sharing and team-based compensation create the same steering risks as individual transaction-based compensation:
>
> [P]rofit-sharing plans or non-qualified plans may reflect transaction terms of multiple individual loan originators taken in the aggregate. Consequently, these types of compensation programs create potential incentives for individual loan originators to steer consumers to particular transaction terms based on the interests of the loan originator

rather than the consumer, which is one of the fundamental problems that TILA section 129B(c) and the existing regulation are designed to address.

*Id*. at 11337.

19. Congress and CFPB explained why such incentives were both improper and dangerous to consumers:

In a perfectly competitive and transparent market, competition would ensure that this incentive would be countered by the need to compete with other loan originators to offer attractive loan terms to consumers. However, the mortgage origination market is neither always perfectly competitive nor always transparent, and consumers (who take out a mortgage only a few times in their lives) may be uninformed about how prices work and what terms they can expect. This compensation structure was problematic…because the loan originator had an incentive to steer borrowers into less favorable pricing terms…

*Id.* at 11286.

20. As recognized by both CFPB and the Federal Reserve Board, the functional lack of transparency in shopping for a mortgage limited the viability of a truly competitive market. *See id.*

21. Both the CFPB and the Federal Reserve Board also noted that due to the complexity of residential mortgage products, the limitations inherent in shopping for mortgages, and consumers' lack of experience and/or understanding, consumers had little choice but to rely on the goodwill of the lender and loan originator to ensure they were getting the best price available. *See id.* at 11284.

22.    Yet, as the Federal Reserve Board recognized, loan originators had an undisclosed financial incentive adverse to the interest of the borrower. *See* Federal Reserve System, *Truth in Lending: Final rule; official staff commentary,* 75 Fed. Reg. 58509, 58510 (September 24, 2010).

23.    In direct violation of these rules and comments, loanDepot requires its Production Managers to engage in origination activities; yet impermissibly pays them based on the profitability of the loans that are sold under their supervision.

24.    Production Managers spend approximately fifty percent (50%) of their time engaged in sales activities directly with consumers.  Production Managers engage in all the same activities with these consumers as loan officers.  Indeed, Production Managers negotiate rates and terms with customers, structure deals with customers, and recommend products to customers.

25.    Production Managers also decide when and whether to provide pricing concessions when demanded by customers who have been contacted by loanDepot about a potential loan scenario.  Pricing concessions include reductions in interest rates and/or reductions in upfront loan fees.  Production Managers also resell loans when problems associated with a file may require a restructuring of the loan midstream.  When that happens, the new terms have to be sold to, and negotiated with, the consumers.

26.     Production Managers are also required to engage with consumers as a "second voice" when their subordinate loan officers fail to convince consumers to purchase maximally priced, profit-optimized loans. A "second voice" merely means an escalation of the same sales activities loan originators perform reinforced by more experienced Production Managers, who perform the exact same duties with respect to that consumer.

27.     This second level sales practice is often associated with loanDepot's inflated initial pricing.  Customers that shop with multiple lenders and obtain better terms through a competitor are escalated to Production Managers in an effort to get the borrower to move forward with loanDepot notwithstanding its inflated pricing. If that is not possible, Production Managers have limited authority to grant pricing concessions (reductions in interest rate or upfront fees) and they are expected to convince consumers to move forward with loans with minimal concessions within their authority.   Additionally, Production Managers have the ability to seek approval from their managers when necessary.  However, the more discounts are approved/sought by Production Managers, and the more frequent those concessions are provided, the less a Production Manager earns from the loans closed by his team, creating a powerful incentive to maintain the highest pricing on loans offered to consumers in violation of the Loan Officer Compensation Rule.

28. The following former loanDepot employees attested to these facts in the attached Declarations. Ben Kelley ("Kelley") was a Vice President of loanDepot from 2019-2021 and subsequently became a loanDepot Senior Vice President. *See* Declaration of Ben Kelley at ¶ 1, attached hereto as Exhibit B. Kelley oversaw teams of Production Managers and confirmed that Production Managers were expected to spend approximately half their time engaged in selling loans to consumers, negotiating loan terms, structuring loans, and convincing customers to move forward with loanDepot instead of its competitors. *Id.* at ¶ 2. Production Managers were financially incentivized not to approve pricing concessions and instead convince customers to proceed without reductions to rates and fees. *Id.* at ¶¶ 3-4. Mr. Kelley similarly recalled frequent changes to Production Managers' compensation but that a constant in every compensation package was the effect of concessions and discounts on Production Manager's pay. *Id.* at ¶ 4.

29. Kyle Fleeger ("Fleeger") started his employment with loanDepot in 2016 and worked there until November 2025. *See* Declaration of Kyle Fleeger at ¶ 1, attached hereto as Exhibit C. Fleeger's most recent position was Vice President of Direct Lending. *Id.* Throughout Fleeger's tenure at loanDepot, he directly and indirectly supervised Production Managers and also served as a Production Manager for a short period. *Id.*

30.     According to Fleeger, Production Managers were responsible for driving their teams' sales by coaching loan officers, communicating with customers, and serving as a second voice on sales calls. *Id.* at ¶ 2. If a loan officer had problems closing a sale, they escalated the call to a Production Manager, who then acted as a second voice on the sales call, reinforcing the loan officer's position, communicating with the customer, and reviewing the customer's profile and application to determine whether to provide any discounts in loan terms, accept customers' requests on terms, and generally negotiate the terms of the loan with the customer. *Id.* Through these efforts, Production Managers typically reviewed not only the loan application but also the customer's entire loan file to understand their profile. *Id.*

31.     Production Managers also filled in for loan officers from time to time, for example if a customer called in when a loan officer was not available or the only time convenient for a customer did not work with a loan officer's schedule. *Id.* at ¶ 3. In those cases, a Production Manager helped complete the loan application from the loan officer's loan portal for the loan officer and e-signed the loan officer's name to the application. *Id.*

32.     Production Managers also had to restructure loans, reviewing the terms and conditions and modifying them when problems arose. *Id.* at ¶ 4. In those cases, Production Managers reviewed the entire file and loan application,

modifying the terms as needed to allow the loan to proceed, essentially presenting the revised loan terms to the customer. *Id.*

33.    loanDepot maintained a "no steering policy," and loan officers told customers that they were not compensated based on the terms of their loan because of that policy. *Id.* at ¶ 7. However, Production Managers' pay was affected by the amount of revenue their teams generated on the loans the teams originated. *Id.* As such, Production Managers' pay was affected by the terms of loans they sold and the terms of loans in which they assisted their teams in selling to customers. *Id.*

34.    Enrique Cotto ("Cotto") was a loan officer who reported to at least three different Production Managers during the course of his employment at loanDepot from 2019 to 2026. *See* Declaration of Enrique Cotto at ¶ 1, attached hereto as Exhibit D. Cotto was also offered on multiple occasions the opportunity to become a Production Manager. *Id.* at ¶ 2. Cotto confirmed both from his experience working with multiple Production Managers, as well as from conversations with executives offering him the position, that the Production Managers' job was "second level" sales. *Id.* at ¶ 3. That is, Production Managers were expected to follow up with customers and attempt to convince them to proceed with loans based on the terms and rates offered and discourage discounting loans through pricing exceptions, as well as make decisions on terms customers

requested. *Id.* at ¶ 4. Although Mr. Cotto had less transparency into Production Managers' compensation, he knew that the more consumers' loan terms were discounted, the less Production Managers earned. *Id.* at ¶ 5.

35.    Interviews of multiple other former loanDepot personnel confirm the Company clearly violated the Loan Officer Compensation Rule.  Multiple former employees confirm that loanDepot required Production Managers to influence their sales teams to drive loanDepot's initial pricing (called "par" pricing) and discourage discounts.  When customers–typically after having connected with competitors–pushed back on the price, Production Managers were ideally supposed to use their sales skills to convince customers to move forward on the original terms. Only if the Production Manager was unsuccessful and determined it was prudent to offer a pricing concession would Production Managers then authorize -- or for larger pricing exceptions recommend and seek approval for -- a reduction in loan terms. However, the greater the extent and frequency of rate/fee reductions, the less Production Managers earned.

36.    Moreover, former loanDepot employees reported that because the Company's initial pricing in the Consumer Direct division was routinely higher than competitors, it was often the case that concessions in pricing were required when customers sought loan offers from competitors.  *See* Declaration of Kevin Wong ("Wong") at ¶ 3, attached hereto as Exhibit E; Declaration of Shawn Way

("Way") at ¶ 3, attached hereto as Exhibit F; Declaration of David Harned ("Harned") at ¶ 3, attached hereto as Exhibit G.

37.    Indeed, Wong, who held a Production Manager position up until approximately 2022, confirms that one of the main reasons he would speak to consumers was because the original price offered to consumers was often higher than what competitors were offering.  It was then his job as a Production Manager to minimize the amount of the concessions needed to convince the borrowers to move forward with a loan.  In fact, his compensation was structured to specifically reward him for offering smaller concessions to borrowers and offering those concessions less frequently. *See* Wong Decl. at ¶ 4-5.

38.    Harned stated that it was a nearly daily occurrence that he would be asked to speak to customers who received written offers from competitors with terms more favorable than those initially offered by loanDepot, and that it was his job to get those borrowers to move forward without concessions or with the smallest concessions on loan terms possible.  The more concessions he offered and the larger the concessions offered to consumers, the more his compensation was adversely affected.  *See* Harned Decl. at ¶ 3-4.

39.    Wong specifically declared under oath that "loanDepot's business model was to price loans higher at the outset and then reduce the price as needed to match competitors if and when a customer provided a loan estimate with a lower

rate and/or upfront fees." *See* Wong Decl. at ¶ 3.   Hence, it appears one of the primary purposes of production managers was to facilitate a compensation structure that allowed loanDepot to obtain a competitive advantage over other lenders by circumventing the LO Comp Rule, which was specifically designed to eliminate incentives that would cause loan originators to offer anything but the best pricing up front to the consumer.

40.    And loanDepot's desire to use this competitive advantage to its full potential is revealed by the fact that multiple former employees, including but not limited to Wong and Harned, have confirmed that when loanDepot wanted to use this flexibility to target a competitor, Production Managers would be advised to grant any exceptions – even if loanDepot was losing money on a loan – to undercut specific competitors, including specifically, West Capital Lending. *See* Wong Decl. at ¶ 6; Harned Decl. at ¶ 6.  In other words, Production Managers were told that if a borrower had a competitive offer from West Capital Lending, they were to offer any price to undercut West Capital so that the consumer would not move forward with West Capital.

41.    As set forth above, loanDepot could not have engaged in an intentional effort to undercut the pricing of West Capital and other lenders without its entire scheme to increase its profits and flexibility as described herein through its ongoing violations of the LO Comp Rule.

42.    Consistently, loanDepot former employees–although operating under the belief that the Company highly valued compliance and had specifically validated the legality of its compensation practices–felt it was unfair that Production Managers had to sacrifice their compensation to sell loans to match the terms offered by loanDepot's competitors because loanDepot's par pricing was often higher than those competitors.  *See* Way Decl. at ¶¶ 3-5, Wong Decl. at ¶¶ 3, 5, 7, Harned Decl. at ¶¶ 3-4, 7.

43.    The effect of loanDepot's illegal compensation Plan is threefold: (a) loanDepot's Production Managers are financially incentivized to steer consumers into maximally priced, profit-maximized loans, and if they fail to do so, their Team Bonus is reduced as a result of the Pricing Exceptions given to consumers; (b) an illegal profit surplus funded by maximally priced, profit maximized loans allows loanDepot greater flexibility to match competitors; and (c) the diversion of compensation otherwise payable to Production Managers offsets the loss of profit associated with Pricing Exceptions, providing increased flexibility to match competitors.

44.    These illegal practices allow loanDepot to unlawfully and systematically undercut competitors who: (a) cannot incentivize production staff to seek maximally priced, profit-maximized loans; and (b) must adhere to a compensation system that incentivizes production staff to offer consumers the

lowest marketable price available in order to increase loan volume, which is the only legal basis for production staff to increase personal income.

45. As set forth herein, loanDepot utilized these practices specifically to target West Capital Lending in a manner reflecting an unfair commercial practice.

## COUNT I
### Violation of the California Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code § 17200 et seq.

46. Plaintiff incorporates the foregoing paragraphs.

47. Within the four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendant has engaged, and continues to engage, in unlawful and unfair trade practices in California by engaging in the conduct detailed in this Complaint.

48. In particular, Defendant has engaged, and continues to engage, in unlawful and unfair practices by, without limitation, violating the Truth in Lending Act, 15 U.S.C. § 1639b(c)(1) based on the compensation practices of its Consumer Direct Division.

49. Defendant engaged in these unlawful and unfair practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

50.    The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors, specifically Plaintiff, as well as injury to consumers.

51.    Defendant's practices specifically targeted Plaintiff, and Plaintiff can identify specific loan transactions from Defendant's Consumer Direct division in which Defendant targeted consumers intending to do business with Plaintiff in order to undermine Plaintiff's business.  Defendant utilized its illegal scheme to obtain an unfair competitive advantage by offsetting losses by withholding compensation and subsidizing pricing concessions meant to undermine Plaintiff's competitiveness, through illegal incentives aimed at unlawfully maximizing its profits on other loans.

52.    As a direct and proximate result of such actions, Plaintiff has suffered, and continues to suffer, diminished market share and has been forced to spend more to compete for consumers. In addition, the value of Plaintiff's efforts to secure consumers was diminished by Defendant's actions. Further, Defendant has diverted consumers that intended to and would otherwise have done business with Plaintiff. This harm is continuous and ongoing. The harm is particularly pronounced because loanDepot and West Capital both operate in the same geographic area and therefore both compete for the same consumers.

53.     Injunctive relief is necessary and appropriate under the UCL to prevent Defendant from continuing its unlawful compensation practices that harm consumers and competitors alike.

### COUNT II
### Declaratory Judgment 28 U.S.C. § 2201

54.     Plaintiff incorporates the foregoing paragraphs.

55.     An actual, justiciable controversy exists regarding whether Defendant compensation practices in the Consumer Direct Division violate the Truth in Lending Act, 15 U.S.C. § 1639b(c)(1), and its implementing regulations.

56.     Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaratory judgment that Defendant's compensation practices in the Consumer Direct Division violate 15 U.S.C. § 1639b(c)(1) and its implementing regulations.

57.     Plaintiff contends that Defendant's compensation practices, which link Production Manager compensation to loan terms, pricing exceptions, and loan profitability, constitute systematic violations of the Loan Officer Compensation Rule.

58.     The parties have adverse legal interests regarding the lawfulness of Defendant's compensation practices.  Defendant has taken the position that its compensation practices are lawful and in compliance with TILA and Regulation Z, while Plaintiff contends that such practices constitute systematic violations of federal law.

59.     This controversy is ripe for judicial resolution. Defendant's challenged compensation practices are ongoing, and absent a judicial determination, the uncertainty regarding the legality of Defendant's conduct will continue, causing ongoing harm to Plaintiff, other competitors, and consumers in the residential mortgage market.

60.     The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors, specifically Plaintiff, as well as injury to consumers.

**61.**     As a direct and proximate result of such actions, Plaintiff has suffered diminished market share and has been forced to spend more to compete for consumers.  In addition, the value of Plaintiff's efforts to secure consumers was diminished by Defendant's actions.  Further, Defendant has diverted consumers that intended to do business with Plaintiff and would have otherwise chosen Plaintiff to handle their loan transactions.  The harm is particularly pronounced because loanDepot and West Capital both operate in the same geographic area and therefore both compete for the same consumers.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff West Capital respectfully requests the following relief against Defendant loanDepot:

A. A declaratory judgment pursuant to 28 USC § 2201 declaring that Defendant's compensation practices violate the Truth in Lending Act, 15 U.S.C. § 1639b(c)(1), and its implementing regulations;

B. Injunctive relief pursuant to California Business and Professions Code § 17203 enjoining Defendant, its officers, agents, employees, and all persons acting in concert with them, from:

    a. Compensating Production Managers or any other mortgage originators based on the terms of loans, including but not limited to interest rates, fees, or pricing exceptions, in violation of 15 U.S.C. § 1639b(c)(1) and its implementing regulations;

    b. Implementing, maintaining, or enforcing the Production Manager Compensation Plan or any similar compensation structure that links originator compensation to loan profitability or pricing concessions;

    c. Directing or incentivizing Production Managers to steer consumers into higher-priced loans or to discourage pricing concessions based on compensation considerations; and

    d. Engaging in any other practices in its Consumer Direct division that violate the Loan Officer Compensation Rule;

C. Restitution of money or property in which Plaintiff has a vested interest that was wrongfully acquired by Defendant through its unlawful business practices, pursuant to Business and Professions Code § 17203;

D.   Such further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff respectfully requests and demands a jury trial on all issues so triable.

Dated: March 6, 2026

Respectfully submitted,

_____

RYAN E. STEARNS, State Bar No. 165262
STEARNS & RYAN, LAWYERS
21250 Hawthorne Boulevard, Suite 310
Torrance, CA 90503
Phone:      (310) 793-9570
Fax:      (310) 793-9575
rstearns@stearnsandryan.com

Arielle Stephenson, State Bar No. 336434
Ellen Boyd, State Bar No. 339542
MITCHELL SANDLER PLLC
2020 K Street NW, Suite 760
Washington, D.C. 20006
202.886.5260
astephenson@mitchellsandler.com
eboyd@mitchellsandler.com

*Attorneys for Plaintiff West Capital Lending, Inc.*