RYAN E. STEARNS, State Bar No. 165262
rstearns@stearnsandryan.com
STEARNS & RYAN, LAWYERS
21250 Hawthorne Boulevard, Suite 310
Torrance, CA 90503
Phone:      (310) 793-9570
Fax:        (310) 793-9575

Arielle Stephenson, State Bar No. 336434
Ellen R. Boyd, State Bar No. 339542
MITCHELL SANDLER PLLC
2020 K Street NW, Suite 760
Washington, D.C. 20006
202.886.5260
astephenson@mitchellsandler.com
eboyd@mitchellsandler.com

*Attorneys for Plaintiff West Capital Lending, Inc.*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WEST CAPITAL LENDING, INC., <br><br> Plaintiff, <br><br> vs. <br><br> LOANDEPOT.COM, LLC, <br><br> Defendant. | Civil Action No. 8:26-cv-00522-JDE <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT** <br><br> Date: August 6, 2026 <br> Time: 10:00 a.m. <br> Dept.: Courtroom 6A, 6th Floor <br> Judge: Hon. John D. Early |

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................3

I.      The LO Compensation Rule Prohibits Compensation Tied to Loan
        Terms ...................................................................................................3

II.     The Complaint Provides Sufficient Facts Establishing that its
        Production Managers Engaged in Origination Activities ......................6

III.    The Complaint Establishes loanDepot Illegally Linked Compensation
        to Loan Terms ......................................................................................8

IV.     loanDepot's Actions are Unfair to Its Competitors Including WCL .......10

ARGUMENT ...................................................................................................14

I.      WCL has Standing to Bring its Claims Under both Article III and
        the UCL ...............................................................................................14

   A.   Standing Element #1: WCL Suffered Injury-In-Fact ..............................16

   B.   Standing Element #2: loanDepot Caused WCL's Injuries .....................19

   C.   Standing Element #3: WCL's Claims Are Redressable Through
        Injunctive Relief ..................................................................................21

II.     WCL States a Valid Enforceable UCL Claim.........................................22

   A.   WCL Alleges Sufficient Facts to Establish a Claim Under the UCL's
        Unlawful Prong ....................................................................................22

      1.   WCL Can Base its UCL Claim on TILA Violations ...........................23

      2.   WCL Sufficiently Alleges loanDepot Violated the LO Compensation
           Rule ................................................................................................24

         i.   Production Managers are Originators Under the LO Compensation
              Rule's Definitions..........................................................................25

         ii.  Production Managers' Compensation was Linked to Customers'
              Loan Terms ...................................................................................26

3.   WCL Meets All Elements of a UCL Claim Predicated on Unlawful Conduct ...................................................................................26

B.   WCL States a Valid Enforceable Unfair-Prong Claim............................27

III.   The Complaint Properly Seeks Declaratory Relief.................................28

IV.   Fed. R. Civ. P. 9(b) Does Not Apply .......................................................29

CONCLUSION ..................................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*Alas v. AT&T Inc.*,
 2018 WL 6133648 (C.D. Cal. Oct. 29, 2018) ......................................................16

*AngioScore, Inc. v. TriReme Medical, LLC*,
 70 F. Supp. 3d 951 (N.D. Cal. 2014)..................................................................17

*California Medical Assoc. v. Aetna Health of California Inc.*,
 14 Cal. 5th 1075 (Cal. 2023) ............................................................................16

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
 20 Cal. 4th 163 (1999).................................................................................27, 28

*Chabner v. United of Omaha Life Ins., Co.*,
 225 F.3d 1042 (9th Cir. 2000) ............................................................................22

*Colopy v. Uber Techs. Inc.*,
 2020 WL 3544982 (N.D. Cal. June 30, 2020)....................................................28

*Gaines v. Home Loan Ctr., Inc.*,
 2011 WL 13182970 (C.D. Cal. Dec. 22, 2011)...................................................15

*Haynes v. Anderson & Strudwick, Inc.*,
 508 F. Supp. 1303 (E.D. Va. 1981) ...................................................................30

*Howard v. Roman Catholic Archbishop of Los Angeles*,
 2026 WL 222258 (Cal. Ct. App. Jan. 28, 2026)................................................17

*In re Actimmune Mktg. Litig.*,
 2010 WL 3463491 (N.D. Cal. Sept. 1, 2010)......................................................22

*In re PowerSchool Holdings, Inc. & PowerSchool Grp., LLC
 Customer Sec. Breach Litig.*,
 2026 WL 817637 (S.D. Cal. Mar. 19, 2026)......................................................29

*Ivanoff v. Bank of America, N.A.*,
 9 Cal. App. 5th 719 (2017).........................................................................15, 23

*Jones v. L.A. Cent. Plaza LLC*,
 74 F.4th 1053 (9th Cir. 2023)...........................................................................14

*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011)......................................................................................15, 16

*Law Offices of Mathew Higbee v. Expungement Assistance Services*,
  214 Cal. App. 4th 544 (2013)..................................................................................17

*Leite v. Crane Co.*,
  749 F.3d 1117 (9th Cir. 2014).................................................................................16

*Levitan v. McCoy*,
  2001 WL 1117279 (N.D. Ill. Sept. 21, 2001).........................................................30

*Lopez v. Stages of Beauty, LLC*,
  307 F. Supp. 3d 1058 (S.D. Cal. 2018) ...................................................................17

*Markovic v. New York City Sch. Const. Auth.*,
  2000 WL 1290604 (S.D.N.Y. Sept. 13, 2000) ........................................................29

*Maxwell v. Union Fidelity Mortg., Inc.*,
  2009 WL 426189 (E.D. Cal. Feb. 19, 2009) ...........................................................30

*Moement, Inc. v. Groomore, Inc.*,
  2022 WL 18284405 (C.D. Cal. Nov. 29, 2022) ......................................................18

*Obesity Research Institute, LLC v. Fiber Research International, LLC*,
  165 F. Supp. 3d 937 (S.D. Cal. 2016) .....................................................................18

*Pet Food Express, Ltd. v. Applied Underwriters, Inc.*,
  2019 WL 4318584 (E.D. Cal. Sept. 12, 2019) ........................................................15

*Quach v. Citimortgage Inc.*,
  2010 WL 3211937 (N.D. Cal. Aug. 12, 2010).........................................................29

*Reid v. Johnson & Johnson*,
  780 F.3d 952 (9th Cir. 2015)...................................................................................14

*Roberson v. Pocker*,
  2024 WL 2984026 (C.D. Cal. Apr. 3, 2024)...........................................................17

*Rose v. Bank of America, N.A.*,
  57 Cal. 4th 390 (2013)............................................................................................23

*Rubio v. Capital One Bank*,
   613 F.3d 1195 (9th Cir. 2010)......................................................................23

*Souter v. Edgewell Pers. Care Co.*,
   542 F. Supp. 3d 1083 (S.D. Cal. 2021) ........................................................14

*Spanish Broad. Sys., Inc. v. Grupo Radio Centro LA, LLC*,
   2016 WL 9049646 (C.D. Cal. Sept. 22, 2016) .............................................15

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ......................................................................................14

*Staley v. Americorp Credit Corp.*,
   164 F. Supp. 2d 578 (D. Md. 2001)...............................................................30

*Standard Oil Co. of New Jersey v. United States*,
   221 U.S. 1 (1911) ..........................................................................................13

*Swanagan v. Al Piemonte Ford Sales, Inc.*,
   1995 WL 493480 (N.D. Ill. Aug. 15, 1995)..................................................30

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ......................................................................................14

*Troyk v. Farmers Group, Inc.*,
   171 Cal.App.4th 1305 (2009)........................................................................24

*Vallies v. Sky Bank*,
   583 F. Supp. 2d 687 (W.D. Pa. 2008) ..........................................................30

*Velazquez v. GMAC Mortgage Corp.*,
   605 F.Supp.2d 1049 (C. D. Cal. 2008)..........................................................24

*Zamfir v. CasperLabs, LLC*,
   2023 WL 2415262 (S.D. Cal. Mar. 8, 2023)..................................................15

*Zucker v. Katz*,
   708 F. Supp. 525 (S.D.N.Y. 1989) ...............................................................29

**Statutes and Rules**

12 C.F.R. § 1026.36 .................................................................................*passim*

15 U.S.C. § 1602 ....................................................................................................25

Cal. Bus. & Prof. Code § 17204.......................................................................16, 21

**Other Authorities**

61 Cal. Jur. 3d Unfair Competition § 12, *Predicate or Underlying Laws as Establishing Unlawful or Unfair Practices Under Unfair Competition Law* (May 2026 update) ...........................................................................................23

Loan Originator Compensation Requirements Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 11,280 (Feb. 15, 2013)................................4, 5

# INTRODUCTION

West Capital Lending ("WCL") filed this action alleging that loanDepot.com, LLC ("loanDepot") systematically violated the Truth in Lending Act's ("TILA") Loan Originator Compensation Rule ("LO Compensation Rule") and leveraged those violations to gain an unfair competitive advantage in the residential mortgage market, in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq. loanDepot's violations of the LO Compensation Rule provide it the ability to have substantially more flexibility than its competitors, who cannot: (i) offset reductions in loan terms by decreasing employees' compensation; (ii) incentivize loan officers to offer initially higher rates and then decrease them to match competitors; and (iii) use excess profits generated from those unlawful incentives to offset targeted reductions on specific loans. These business practices provide unfair competitive advantages that loanDepot has used to target competitors such as WCL.

Indeed, the purpose of the LO Compensation Rule is to protect consumers by eliminating the ability and incentive to steer borrowers into less favorable loans and promoting transparency and competition throughout the mortgage lending process. Instead, the LO Compensation Rule eliminates any incentive to attempt to initially offer higher pricing and lower it as needed. Thus, loanDepot's competitors adhere to a system that is specifically designed to incentivize loan officers to offer the best

price available at the outset with limited ability to match a competitor given that the loan officer already offered their most competitive price up front. Additionally, a compliant lender has limited means to offer strategic deep discounts as a result of the consistent baseline pricing being offered to its consumers. loanDepot, on the other hand, can isolate particular loans/borrowers to offer low pricing, offset by illegally incentivized excessive profits on other customers and by unlawful reductions in compensation. loanDepot's flexibility results from its violations of federal lending laws and is being used as a hammer against its competitors, including WCL.

loanDepot's attempt to portray itself as the benevolent corporate player offering consumers lower rates is mere subterfuge. In fact, loanDepot is gaming the system on a wide-scale basis to give itself a competitive advantage that no other competitor is permitted—the quintessential UCL violation. Indeed, allegations in the Complaint and supporting Declarations show that loanDepot did not offer lower pricing—it initially offered excessively high priced loans and only lowered it in selective cases to beat a competitor, using its excess profits and curtailed compensation of employees to cut prices below what was profitable on a particular loan. And its competitors including WCL—who lack the flexibility to start with high prices and selectively reduce—were inherently at a disadvantage because they lacked the ability to offset customer discounts. loanDepot's disingenuous narratives

aside, do not support dismissal, particularly at the pleading stage. Accordingly, loanDepot's motion to dismiss should be denied in its entirety. Should the Court nonetheless find any deficiency in the Complaint, dismissal should be with leave to amend. loanDepot's request for dismissal with prejudice is unwarranted: any pleading defect could be cured through additional factual allegations, and leave to amend is freely given unless amendment would be futile.

## BACKGROUND

### I. The LO Compensation Rule Prohibits Compensation Tied to Loan Terms

Prior to the financial crisis of 2008, lenders compensated loan officers based upon the rates and terms of the loans they sold to borrowers. Hence, the higher the rates and fees charged to consumers, the more the loan officers were paid. In essence, loan officers were financially incentivized to maximize the rates and fees of the loans sold to their borrowers. Congress and the Consumer Financial Protection Bureau ("CFPB") determined that such incentives were both improper and dangerous to consumers:

> In a perfectly competitive and transparent market, competition would ensure that this incentive would be countered by the need to compete with other loan originators to offer attractive loan terms to consumers. However, the mortgage origination market is neither always perfectly competitive nor always transparent, and consumers (who take out a mortgage only a few times in their lives) may be uninformed about how prices work and what terms they can expect.

*Loan Originator Compensation Requirements Under the Truth in Lending Act (Regulation Z)*, 78 Fed. Reg. 11,280, 11,286 (Feb. 15, 2013).

Following the financial crisis and passage of the Dodd Frank Financial Reform Act in 2010, the LO Compensation Rule was passed to eradicate the conflict of interest that existed between loan officers and borrowers who relied on them to obtain their mortgage loans. The LO Compensation Rule states:

> [I]n connection with a consumer credit transaction secured by a dwelling, no loan originator shall receive and no person shall pay to a loan originator, directly or indirectly, compensation in an amount that is based on a term of a transaction…

12 C.F.R. § 1026.36(d)(1)(i).

The commentary to the LO Compensation Rule makes clear that it applies to managers that negotiate loan terms directly with consumers—such as loanDepot's Production Managers—even if those managers perform additional duties unrelated to originations. *See* 12 C.F.R. § 1026.36 cmt. 36(a)(4)(v) ("The definition of loan originator includes persons, including managers, who are employed by a creditor or loan originator organization and take an application, offer, arrange, assist a consumer with obtaining or applying to obtain, negotiate, or otherwise obtain or make a particular extension of credit for another person, even if such persons are also employed by the creditor or loan originator organization to perform duties that are not loan origination activities. Thus, such producing managers are loan originators.").

The bar on term linked compensation applies not only to the loans directly originated by Production Managers, but also to all loans originated by teams of individuals performing loan origination activities collectively:

> [I]n connection with a consumer credit transaction secured by a dwelling, no loan originator shall receive and no person shall pay to a loan originator, directly or indirectly, compensation in an amount that is based on a term of a transaction, the terms of multiple transactions by an individual loan originator, **or the terms of multiple transactions by multiple individual loan originators**.

12 C.F.R. § 1026.36(d)(1)(i) (emphasis added).

CFPB has also made clear that the LO Compensation Rule cannot be circumvented through "team based" compensation plans, which increase Production Manager compensation based upon loans originated in the name of subordinate loan officers:

> [P]rofit-sharing plans…or non-qualified plans may reflect transaction terms of multiple individual loan originators taken in the aggregate. Consequently, these types of compensation programs create potential incentives for individual loan originators to steer consumers to particular transaction terms based on the interests of the loan originator rather than the consumer, which is one of the fundamental problems that TILA section 129B(c) and the existing regulations are designed to address.

*Loan Originator Compensation Requirements*, 78 Fed. Reg. at 11336-11337.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

- 5 -

## II. The Complaint Provides Sufficient Facts Establishing that its Production Managers Engaged in Origination Activities

loanDepot's assertion that WCL's allegations are "vague and conclusory" is completely without merit. *See* Motion to Dismiss (Dkt. 21) at 2, 4-5, and 16. WCL's Complaint (Dkt. 1) not only alleges—it provides specific admissible evidence from no fewer than 6 former loanDepot employees that Production Managers were engaged in origination activities as defined by the LO Compensation Rule. For example, WCL's Complaint states, "Production Managers negotiate rates and terms with customers, structure deals with customers, and recommend products to customers" and describes Production Managers acting as a "Second Voice" selling to borrowers by performing "the same sales activities loan originators perform . . . ." *Id.* at ¶ 26; *see also id* at ¶¶ 24, 30-31, 34. Indeed, loanDepot Production Manager David Harned described his "almost daily" interaction with customers to "sell" them on loan terms:

> On **almost a daily basis** I would be presented with offers from competitors that were giving better rates to borrowers than what loan officers were authorized to offer. When that happened, **my job was to attempt to sell the borrowers at the higher rate initially offered**.

Complaint, Exhibit G at ¶ 3 (emphasis added).

Enrique Cotto ("Cotto")—employed by loanDepot through January 2026—stated in his Declaration that he:

> **regularly** call[ed] customers to engage in second-level sales … **negotiat[ing] rates, fees and terms of a loan, structur[ing] loans, and address[ing] problems that may require changes to a terms or conditions midstream.**

Complaint, Exhibit D at ¶ 3 (emphasis added).

Vice President of Direct Lending Kyle Fleeger ("Fleeger")—employed by loanDepot through November 2025—stated that:

> Production Managers fill[ed] in for loan officers, [e-signing applications with the loan officers' credentials], as well as act[ing] as a second voice on the sales call … reviewing the customer's profile and application to determine whether to **provide any discounts in loan terms, accept customers' requests on terms, and generally negotiate the terms of the loan with the customer.**

Complaint, Exhibit C at ¶¶ 2-3 (emphasis added).

loanDepot Senior Vice President Ben Kelley stated:

> [Production Managers] drive sales and **routinely participate in the sales process by directly engaging with consumers**. Production Managers perform tasks similar to Loan Officers when interacting with customers, such as structuring deals, recommending loan products and scenarios, and **negotiating rates and fees**. **Approximately half of a Production Manager's time is spent on these activities**.

Complaint, Exhibit B at ¶ 2 (emphasis added).

loanDepot Production Manager Kevin Wong stated:

> I would **routinely** be presented with offers from competitors that were giving better rates/fees to borrowers than what loan officers were authorized to offer. When that happened, **my job was to attempt to sell the borrowers at the higher rate initially offered**. If I was unsuccessful at selling the higher rate, I was

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

expected to offer the smallest pricing concession possible to get the borrower to move forward.

Complaint, Exhibit E at ¶ 4 (emphasis added).

loanDepot's disingenuous characterizations to this Court utterly ignore these Declarations as well as the allegations contained in paragraphs 24, 26, 30-31, and 34 of the Complaint, which clearly allege that Production Managers engage in the same loan origination activities as loan officers.

**III.    The Complaint Establishes loanDepot Illegally Linked Compensation to Loan Terms**

loanDepot's Production Manager Compensation Plan (the "Plan") expressly tied its Production Managers' compensation to the amount and frequency of "pricing exceptions" (*i.e.*, discounts, oftentimes abbreviated "PE") were granted to consumers—conduct that is *per se* unlawful under the LO Compensation Rule. *See* Complaint ¶ 13 and Exhibit A. These pricing exceptions were formally memorialized in the Production Managers' bonus structure in the following math equation:

$$\text{Lock Revenue} = ((\text{MSRP} - \textbf{Total PE}) * \text{target ECR}) + (\text{HELOC MSRP} * \text{HELOC ECR})$$

Complaint, Exhibit A § 2 ("Team Bonus").

Beyond the Plan attached to and referenced in the Complaint, there are a bevy of facts set forth in the Declarations confirming that compensation was illegally linked to borrowers' loan terms:

loanDepot Senior Vice President Ben Kelley stated that Production Managers'

> compensation always included a component influenced by the revenue from loans sold by their team and the discounts on rates and fees provided to consumers. Increased approvals for discounts, concessions, or exceptions reduced the Production Manager's monthly compensation.

Complaint, Exhibit B ¶ 4.

loanDepot Vice President Fleeger confirmed that:

> Production Managers' pay was affected by the amount of revenue their teams generated on the loans the teams originated. As such, Production Managers' pay was affected by the terms of loans they sold and assisted loan officers in selling to customers.

Complaint, Exhibit C ¶ 7. *See also* Complaint, Exhibit E ¶ 5 (former production manager admitting that loanDepot "financially incented" him to minimize pricing concessions to customer because "the more and the larger concessions I gave the consumer, the less I would be paid on the loans my team closed"); Complaint, Exhibit F ¶¶ 3-4 (Production Manager complaining it was unfair that "[t]he more concessions I provided the less commission I would receive"); Complaint, Exhibit G ¶¶ 4-5 (Production Manager admitting there were financial incentives linked to the loan terms he negotiated because "my pay was reduced the more concessions I

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

gave to customers, and the larger the concessions I gave to customers."); Complaint, Exhibit D ¶ 5.

There is simply no way for loanDepot to deny that its Production Managers' compensation was inextricably linked to consumers' loan terms given that the bonuses were mathematically reduced by the amount of pricing exceptions given to consumers.

**IV.     loanDepot's Actions are Unfair to Its Competitors Including WCL**

WCL's Complaint and the attached Declarations detail loanDepot's years-long, firmly entrenched mandate to utilize its illegally obtained flexibility to undercut competitors such as WCL. Indeed, multiple Declarants assert that loanDepot's initial pricing was higher than most competitors—in effect, overcharging unsuspecting customers. *See* Complaint, Exhibit E (Kevin Wong Declaration) at ¶ 3 ("loanDepot's initial pricing on loans was often higher than competitors. loanDepot's business model was to price loans higher at the outset and then reduce the price as needed to match competitors if and when a customer provided a loan estimate with a lower rate and/or upfront fees."); Exhibit F (Shawn Way Declaration) at ¶ 3 ("loanDepot's pricing was usually higher than our competitors so when a borrower had a competitive bid, I often had to provide a pricing concession to keep the borrower, but when I did so my compensation was adversely affected."); Exhibit G (David Harned Declaration) at ¶ 3 ("loanDepot's

initial pricing on loans was often higher than competitors. On almost a daily basis I would be presented with offers from competitors that were giving better rates to borrowers than what loan officers were authorized to offer. When that happened, my job was to attempt to sell the borrowers at the higher rate initially offered. When I was unsuccessful at selling the higher rate, I was expected to approve the smallest pricing concession possible to get the borrower to move forward.").

loanDepot's violations of the LO Compensation Rule gave it a flexibility that no rule-compliant lender has: it could overcharge most borrowers, bank the excess profit, and then spend that profit—together with the savings from reduced manager pay—to slash prices on the specific loans where a targeted rival like WCL had bid. That is predatory pricing financed by unlawful conduct, as the Complaint and the Declarations detail.

loanDepot Production Manager David Harned detailed this practice as follows:

> Though I did not have the ability approve all pricing concessions depending on their size (some required higher levels of approval), when it came to loan estimates provided to consumers by West Capital Lending we were instructed to match or undercut West Capital Lending's offer **no matter what**. The Company did not want to lose any deals to West Capital Lending **even if it meant losing money on the loan**.

Complaint, Exhibit G at ¶ 6 (emphasis added).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT
- 11 -

loanDepot Production Manager Kevin Wong similarly described loanDepot's predatory practices:

> Though I was often required to obtain approval for pricing exceptions, this did not apply to matching loan offers from Rocket Mortgage or West Capital Lending. **We were instructed to match or beat the terms offered on such loans even if it meant that loanDepot would lose money on the loan.**

Complaint, Exhibit E at ¶ 6 (emphasis added).

loanDepot Production Manager Shawn Way stated the same, adding that loanDepot's predatory conduct included a negative impact on his compensation:

> loanDepot's pricing was usually higher than our competitors so when a borrower had a competitive bid, I often had to provide a pricing concession to keep the borrower, but **when I did so my compensation was adversely affected.**

Complaint, Exhibit F at ¶ 3 (emphasis added).

Far from speculation, these Declarants describe a pervasive pattern and practice of illegally utilizing compensation incentives designed to encourage inflated loan terms, which loanDepot could then selectively reduce to target competitors, including WCL. loanDepot attempts to gloss over its illegal actions by arguing that "low prices do not amount to *unfair* competition. Competitors can and do 'cut prices' all the time 'in order to increase market share.'" Motion to Dismiss at 10 (emphasis in original). Yet, far from its self-portrayal of a benevolent corporate actor helping consumers obtain lower pricing, loanDepot engaged in predatory practices aimed at both consumers and lenders alike. It violated laws

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

- 12 -

aimed at creating transparency and competition in order to strategically undercut targeted competitors. It then raised prices and reaped excess profits using an unlawful incentive structure which enabled it to target specific customers who were about to close loans with competitors, utilizing flexibility it should never have gained in the first place. loanDepot is no more benevolent today than Standard Oil was in the early 20th Century. *See Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911) (Standard Oil's predatory practice of offering pricing concessions was designed to undercut independent refineries to drive them out of business). In many respects, loanDepot's actions are worse because its anticompetitive conduct is not simply fueled by economics. Rather, it is predicated on the violation of a consumer protection statute aimed at bringing transparency and increased competition to the lending process by incentivizing all loan officers—employed at all mortgage lending institutions—to offer their best pricing upfront. Instead, loanDepot stole from Peter, to undercut offers made by Paul. loanDepot's distortions of the Complaint and attempt to justify its illegal conduct should be rejected—particularly at this stage of the litigation.

## ARGUMENT

### I. WCL has Standing to Bring its Claims Under both Article III and the UCL

To establish standing, a plaintiff must show: (i) that they suffered an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). At the motion to dismiss stage, "the plaintiff must allege sufficient facts that, taken as true, 'demonstrat[e] each element' of Article III standing." *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1057 (9th Cir. 2023) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

Statutory standing under the UCL is "assessed under the Rule 12(b)(6) standard" and requires an economic injury caused by the alleged unfair competition. S*outer v. Edgewell Pers. Care Co.*, 542 F. Supp. 3d 1083, 1090 (S.D. Cal. 2021). The UCL inquiry is materially the same as Article III because the plaintiff must allege a loss or deprivation of money or property sufficient to qualify as injury in fact resulting from the challenged business practice. *See Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015) ("To establish standing to bring a claim under [the UCL], plaintiffs must meet an economic injury-in-fact requirement, which demands no more than the corresponding requirement under Article III of

the U.S. Constitution."); *Ivanoff v. Bank of America, N.A.*, 9 Cal. App. 5th 719, 731-32 (2017) (economic injury is a classic form of injury in fact); *Pet Food Express, Ltd. v. Applied Underwriters, Inc.*, No. 2:16-CV-01211 WBS AC, 2019 WL 4318584, at *3 (E.D. Cal. Sept. 12, 2019) (economic injury must result from the unfair practice alleged).

At the motion to dismiss stage, the pleadings must allege facts showing that WCL suffered economic harm from the UCL violation. *See Spanish Broad. Sys., Inc. v. Grupo Radio Centro LA, LLC*, No. CV 16-00980-BRO (GJSx), 2016 WL 9049646, at *4-5 (C.D. Cal. Sept. 22, 2016). But the UCL does not require WCL to prove or quantify at the pleading stage each diverted loan transaction; it is enough to allege specific facts showing an ongoing scheme that caused WCL to lose market share, customers, or money. *See Zamfir v. CasperLabs, LLC*, No. 21-CV-474 TWR (AHG), 2023 WL 2415262, at *8 (S.D. Cal. Mar. 8, 2023) (At the pleading stage of a UCL claim, "general factual allegations of injury resulting from the defendant's conduct may suffice."); *Gaines v. Home Loan Ctr., Inc.*, No. SACV 08-667-JST (RNBx), 2011 WL 13182970, at *4 (C.D. Cal. Dec. 22, 2011) (stating same); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 327 (2011) ("At the pleading stage [of a UCL claim], general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that

general allegations embrace those specific facts that are necessary to support the claim.'").[1]

A. Standing Element #1: WCL Suffered Injury-In-Fact

California's unfair competition law, Cal. Bus. & Prof. Code § 17204, confers standing on "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." The California Supreme Court has made clear that the type of economic harm necessary under the UCL for standing is the loss of money or property in "any nontrivial amount," oftentimes described as a "trifle." *Kwikset Corp.*, 51 Cal. 4th at 324-325; *California Medical Assoc. v. Aetna Health of California Inc.*, 14 Cal. 5th 1075, 1088 (Cal. 2023) ("A showing of economic injury requires only that the plaintiff allege or prove 'a personal, individualized loss of money or property in any nontrivial amount. … [A] specific measure of the amount of this loss is not required. It suffices that a plaintiff can allege an 'identifiable trifle' of economic injury.") (internal citations omitted); *Roberson v.*

---

[1] loanDepot's motion to dismiss under Fed. R. Civ. P. 12(b)(1) applies the same standards as Fed. R. Civ. P. 12(b)(6). *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014), *cert. denied*, 574 U.S. 934 (2014) ("The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction."); *Alas v. AT&T Inc.*, No. LACV 17-08106-VAP (RAOx), 2018 WL 6133648, at *3 (C.D. Cal. Oct. 29, 2018) (stating same).

*Pocker*, No. 8:23-CV-01445-JVS-ADS, 2024 WL 2984026, at *9 (C.D. Cal. Apr. 3, 2024) ("[A] specific measure of the amount of this loss is not required. It suffices that a plaintiff can allege an 'identifiable trifle' of economic injury."); *Howard v. Roman Catholic Archbishop of Los Angeles*, No. B333546, 2026 WL 222258, at *6 (Cal. Ct. App. Jan. 28, 2026) (stating same); *Law Offices of Mathew Higbee v. Expungement Assistance Services*, 214 Cal. App. 4th 544, 561 (2013) ("[I]dentifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation"); *Lopez v. Stages of Beauty, LLC*, 307 F. Supp. 3d 1058, 1069 (S.D. Cal. 2018) ("To establish injury under the UCL, a plaintiff needs to demonstrate that he lost money or property. This requirement is met so long as the plaintiff shows some specific, identifiable trifle or injury.") (internal citations omitted).

Contrary to loanDepot's contention, California courts regularly recognize loss of market share and customers as cognizable injuries under UCL that confer standing. *See, e.g.*, *AngioScore, Inc. v. TriReme Medical, LLC*, 70 F. Supp. 3d 951, 962 (N.D. Cal. 2014) ("an injury to market share suffered as a result of a competitor's unfair business practice is a cognizable injury under the UCL."); *Law Offices of Mathew Higbee*, 214 Cal. App. 4th at 556–61 (surveying UCL competitor cases where injuries to market share were deemed sufficient); *Obesity Research Institute, LLC v. Fiber Research International, LLC*, 165 F. Supp. 3d 937, 948 (S.D.

Cal. 2016) (UCL standing satisfied by alleging "lost sales, market share, and goodwill"); *Moement, Inc. v. Groomore, Inc.*, No. 2:22-CV-02871-MWF (JEMx), 2022 WL 18284405, at *11 (C.D. Cal. Nov. 29, 2022) ("The requirement of economic injury necessary to satisfy standing under the UCL is met with a showing of lost 'sales, revenue, market share, and asset value.'").

Here, WCL has clearly alleged the required trifle of economic injury. The Declarants stated again and again that loanDepot instructed them to undercut WCL "no matter what . . . even if it meant losing money on the loan." Complaint, Exhibit G at ¶ 6; Complaint, Exhibit E at ¶ 6. This resulted in loanDepot diverting would-be WCL borrowers from doing business with WCL. *See* Complaint at ¶ 40 ("Production Managers were told that if a borrower had a competitive offer from West Capital Lending, they were to offer any price to undercut West Capital so that the consumer would not move forward with West Capital.").

WCL's Complaint clearly meets this pleading standard bolstered by the Declarations quoted above, which detail loanDepot's unlawful conduct, allowing it enhanced flexibility in pricing that other lenders lacked. That flexibility provides it a competitive advantage, allowing it to reap excess profits and use those profits, as well as reductions in employee compensation, to offer non-profitable loans simply for the purpose of diverting customers away from WCL. *See* Complaint at ¶ 1 ("loanDepot has engaged in a coordinated set of unlawful and unfair business

practices in its Consumer Direct division that are stifling competition in the residential mortgage market, harming consumers in that market, and inflicting immediate and ongoing injury on other lenders, including West Capital, through **loss of market share and customers**.") (emphasis added); Complaint at ¶ 51 ("Defendant's practices specifically targeted Plaintiff, and Plaintiff can identify specific loan transactions from Defendant's Consumer Direct division in which Defendant targeted consumers intending to do business with Plaintiff **in order to undermine Plaintiff's business**.") (emphasis added); Complaint at ¶ 52 ("Plaintiff has suffered, and continues to suffer, **diminished market share** and has been forced to spend more to compete for consumers.").

Such allegations are, at this stage, more than sufficient to establish standing.

B.  Standing Element #2: loanDepot Caused WCL's Injuries

The Declarants unequivocally describe being instructed by loanDepot to systematically undercut WCL's sales efforts through tactics that are specifically made unlawful by TILA (*i.e.*, compensation reductions linked to price exceptions).

But for Defendant's unlawful practices, it could not have initially padded the pricing on its loans while retaining the flexibility to reduce them to match the competition. Rather, if loanDepot had complied with the LO Compensation Rule, it would have been forced to incentivize loan officers to offer the best pricing upfront. And, it would not have the luxury of offsetting targeted loans with excess

profits received on other transactions or reductions in a Production Manager's compensation. On a level playing field where loanDepot and its competitors were operating under the same rules, loanDepot would not have the economic advantage and/or flexibility to seek out specific competitors for the purpose of undercutting their pricing and diverting their customers. loanDepot cannot isolate a particular aspect of its interrelated unlawful actions, ignore that those actions were predicated on its unlawful activity, and somehow suggest its hands are clean. This is exactly the type of argument that fails at the pleading stage, as WCL's factual allegations must be taken as true.

loanDepot's contrary argument—that incentivizing managers to charge more should have driven borrowers to WCL rather than away from it—misreads the Complaint. WCL does not allege a single, uniform pricing direction. It alleges a two-track scheme: loanDepot inflated baseline pricing to extract supra-competitive margins from less-informed borrowers, then deployed the resulting profit cushion and unlawfully reduced manager compensation to selectively undercut the rivals it targeted—matching or beating WCL "no matter what," even at a loss on the particular loan. Complaint, Ex. G ¶ 6; Ex. E ¶ 6. The two tracks are not contradictory; they are complementary halves of one strategy that rule-compliant competitors cannot lawfully replicate.

C. <u>Standing Element #3: WCL's Claims Are Redressable Through Injunctive Relief</u>

The UCL specifically provides for injunctive relief to redress unlawful actions by competitors. *See* Cal. Bus. & Prof. Code § 17204. loanDepot contends that WCL's claim for injunctive relief should be rejected because the Complaint does not demonstrate that any future harm is actual or imminent. *See* Motion to Dismiss at 13. To the contrary, WCL's Complaint describes a years-long, firmly entrenched, unlawful TILA scheme that was expressly memorialized in its own Plan. The Complaint contains Declarations of recently terminated employees describing recent and ongoing practices. *See* Complaint at ¶¶ 1, 41, 47, 48, 52, 53 and 59 (alleging "ongoing" and "continuing" unlawful practices and injuries). Perhaps most tellingly, loanDepot does not suggest in any way that it intends to cease its unlawful practices. Indeed, it contends that it is doing nothing wrong, meaning it is going to continue operating business as usual. Accordingly, WCL has the right to seek injunctive relief.[2]

---

[2]   WCL withdraws its claim for restitution, as set forth in its Prayer for Relief at ¶ C.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT
- 21 -

## II. WCL States a Valid Enforceable UCL Claim

### A. <u>WCL Alleges Sufficient Facts to Establish a Claim Under the UCL's</u> <u>Unlawful Prong</u>

A prima facie UCL unlawful-prong claim requires a predicate violation of law resulting in the loss of money or property, which can be loss of market share, sales, or business opportunities:

> The California Supreme Court has held that section 17200 defines unfair competition very broadly, to include anything that can properly be called a business practice and that at the same time is forbidden by law. By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable. It does not matter whether the underlying statute also provides for a private cause of action; section 17200 can form the basis for a private cause of action even if the predicate statute does not.

*Chabner v. United of Omaha Life Ins., Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000) (internal citations and quotation marks omitted); *In re Actimmune Mktg. Litig.*, No. 08-02376 MHP, 2010 WL 3463491, at *6 (N.D. Cal. Sept. 1, 2010), *aff'd*, 464 F. Appx. 651 (9th Cir. 2011) ("In the context of an unlawful-prong claim, a plaintiff must establish that a defendant engaged in unlawful conduct, *i.e.,* violated a federal, state or municipal statute, ordinance or regulation, and that, as a result of the defendant's unlawful conduct, the plaintiff 'suffered an injury in fact and has lost money or property . . . .'"); *Rose v. Bank of America, N.A.*, 57 Cal. 4th 390, 394

(2013) ("Violations of federal statutes, including those governing the financial industry, may serve as the predicate for a UCL cause of action.").

A leading California treatise discusses these well-established rules:

> "Unlawful practices" prohibited by the Unfair Competition Law (UCL) are any practices forbidden by law. A practice is unlawful under the UCL where it violates a predicate law, that is, a rule contained in some other state or federal statute. Thus, a violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong. . . . Virtually any law or regulation, federal or state, statutory or common law, can serve as a predicate for a violation of the UCL based on an unlawful business act or practice, including federal statutes governing the financial industry.
>
> . . . .It is not necessary that the predicate law provide for private civil enforcement in order for a violation of that law to be actionable under the UCL.

61 Cal. Jur. 3d Unfair Competition § 12, *Predicate or Underlying Laws as Establishing Unlawful or Unfair Practices Under Unfair Competition Law* (May 2026 update).

### 1. WCL Can Base its UCL Claim on TILA Violations

California courts have made it clear that UCL claims may be predicated on TILA violations. *See, e.g., Ivanoff v. Bank of America, N.A.*, 9 Cal. App. 5th 719, 730 (2017) ("complaint alleged the Bank's violation of TILA constituted an unlawful business practice, an appropriate basis for her UCL claim."); *Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010) ("By properly alleging a TILA violation, [plaintiff] has also alleged a UCL violation under the prong of the

UCL that prohibits 'unlawful' business acts or practices." (quoting *Velazquez v. GMAC Mortgage Corp.*, 605 F.Supp.2d 1049, 1068 (C. D. Cal. 2008); *Troyk v. Farmers Group, Inc.*, 171 Cal.App.4th 1305, 1335 (2009), *cert. denied*, 563 U.S. 918 (2011)). loanDepot's assertion that WCL cannot rely on the UCL in this matter because TILA does not provide a private right of action for competitors is simply incorrect.

### 2. WCL Sufficiently Alleges loanDepot Violated the LO Compensation Rule

A violation of the LO Compensation Rule exists once a link can be drawn between the compensation paid and the terms of the loans closed by the customers. According to the LO Compensation Rule's official commentary, one need only review the applicable policies objectively to determine whether there exists a relationship between the loan terms and the loan officer's compensation:

> Whether compensation is "based on" a term of a transaction does not require a comparison of multiple transactions or proof that any person subjectively intended that there be a relationship between the amount of the compensation paid and a transaction term. Instead, the determination is based on the objective facts and circumstances indicating that compensation would have been different if a transaction term had been different. Generally, when there is a compensation policy in place and the objective facts and circumstances indicate the policy was followed, the determination of whether compensation would have been different if a transaction term had been different is made by analysis of the policy.

*See* 12 C.F.R. § 1026.36(d), Comment 36(d)(1)-1(i).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT
- 24 -

### i. Production Managers are Originators Under the LO Compensation Rule's Definitions

According to 15 U.S.C. § 1602, an individual is considered a loan officer under the LO Compensation Rule if they "take[] a residential mortgage loan application; assist[] a consumer in obtaining or applying to obtain a residential mortgage loan; or offer[] or negotiate[] terms of a residential mortgage loan." 15 U.S.C. § 1602(dd)(2)(A)(i)-(iii). Moreover, the fact that someone may also have managerial responsibilities does not negate the applicability of the rule if they otherwise meet the definition of an originator. *See* 12 C.F.R. § 1026.36 cmt. 36(a)(4)(v) ("The definition of loan originator includes persons, including managers, who … take an application, offer, arrange, assist a consumer with obtaining or applying to obtain, negotiate, or otherwise obtain or make a particular extension of credit for another person, even if such persons are also employed by the creditor or loan originator organization to perform duties that are not loan origination activities. Thus, such producing managers are loan originators.").

Here, the complaint is exhaustive in describing how Production Managers routinely engaged in origination activities, including directly negotiating with consumers on a wide-spread, systematic basis and approving the loan terms for consumers. *See supra* Background Section II.

### ii. Production Managers' Compensation was Linked to Customers' Loan Terms

The LO Compensation Rule explicitly provides that managers meeting the definition of an originator cannot be compensated based on the terms of the loans closed by their production teams. *See* s*upra* Background Section I. The Declarations and the Production Manager Compensation Plan attached to the Complaint establish that when Production Managers gave consumers pricing exceptions or other breaks, their compensation was reduced, unequivocally establishing a TILA violation. *See* Background Section III. Clearly, WCL has sufficiently alleged a link between Production Managers' compensation and customers' loan terms.

### 3. WCL Meets All Elements of a UCL Claim Predicated on Unlawful Conduct

As set forth above, the Complaint provides a sufficient factual basis alleging that the Production Managers meet the definition of loan originators. The Complaint further identifies a link between Production Managers' compensation and the terms of the loans closed by their production teams. Thus, WCL sufficiently pleads a claim under the unlawful prong of the UCL. And, as set forth in *supra* Argument Section I, it has established a causal connection between these unlawful practices and the harm it seeks to redress by enjoining loanDepot from continuing to maintain

a competitive advantage by placing itself above the playing field established by the LO Compensation Rule.

### B. WCL States a Valid Enforceable Unfair-Prong Claim

loanDepot's motion also ignores the distinct breadth of the UCL's unfair prong in competitor cases. *See Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 187 (1999) ("unfair" conduct includes "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."). The Complaint alleges that loanDepot used an unlawful compensation structure to create a pricing advantage that compliant competitors could not lawfully replicate, enabling loanDepot to inflate prices to consumers, subsidize targeted discounts, and undercut WCL and other lawful competitors.

The Complaint also alleges a firmly entrenched, companywide practice that distorted competition in the consumer-direct mortgage market. Those allegations do more than plead harm to one competitor; they plead a market-distorting pricing mechanism that rewards higher consumer pricing and funds targeted discounting against rivals through unlawful compensation reductions. Those allegations fit squarely within *Cel-Tech*'s unfair-prong standard. It is also important to note that

*Cel-Tech* focuses on actions that *threaten* an incipient violation or violate the *policy* or *spirit* of the antitrust laws. *Id.* This distinction matters at the pleading stage.

WCL also need not prove monopoly power, below-cost pricing, or a completed restraint of trade to allege that loanDepot's conduct violates antitrust policy by corrupting price competition undermining transparency in the mortgage market and using unlawful regulatory noncompliance as a competitive weapon. WCL's allegations plausibly show that loanDepot's scheme allowed it to extract higher prices from less-informed borrowers, selectively discount to customers who shopped with competitors, and target WCL by undercutting its offers with losses offset through unlawful compensation reductions. loanDepot's competitive advantage is not lower prices achieved through efficiency. It is pricing flexibility produced by a compensation system that the Complaint alleges violates the LO Compensation Rule, harms consumers, and lets loanDepot subsidize targeted discounting in a manner compliant competitors cannot lawfully duplicate. These allegations certainly satisfy the UCL's unfair competition prong.

## III.      The Complaint Properly Seeks Declaratory Relief

As demonstrated above, WCL has a valid UCL claim predicated on widespread TILA violations. That being so, declaratory relief is proper. *See Colopy v. Uber Techs. Inc*., No. 19-CV-06462-EMC, 2020 WL 3544982, at *3 (N.D. Cal. June 30, 2020) (permitting declaratory relief where a valid UCL claim was pled);

*In re PowerSchool Holdings, Inc. & PowerSchool Grp., LLC Customer Sec. Breach Litig.*, No. 25-MD-03149-BEN-MSB, 2026 WL 817637, at \*14 (S.D. Cal. Mar. 19, 2026) (permitting declaratory judgment claim to move forward because it was predicated on other valid claims or relief that were permitted to proceed).

**IV.      Fed. R. Civ. P. 9(b) Does Not Apply**

Rule 9(b) is a special pleading rule contrary to the general philosophy of simplified pleading of the Federal Rules of Civil Procedure. Therefore, "its scope of application should be construed narrowly and not extended to other legal theories or defenses." *Zucker v. Katz*, 708 F. Supp. 525, 530 (S.D.N.Y. 1989) (holding that separate claim for fraudulent concealment did not subject conspiracy claim to the heightened pleading standards of Rule 9(b)).

"[W]hen fraud or mistake does not constitute an essential element of a claim or defense, … Rule 9(b) generally will not apply to the pleading." *Markovic v. New York City Sch. Const. Auth.*, No. 99 CIV. 10339(AGS), 2000 WL 1290604, at \*2 (S.D.N.Y. Sept. 13, 2000) (internal quotations and citations omitted). Neither fraud, nor intent, nor reasonable reliance are elements of WCL's TILA claim, which only requires proof that a Production Manager received "compensation in an amount that is based on a term of a transaction . . ." 12 C.F.R. § 1026.36(d)(1)(i); *see Quach v. Citimortgage Inc.*, No. C09-05607 HRL, 2010 WL 3211937, \*6 (N.D. Cal. Aug. 12, 2010) (TILA and UCL claims were not grounded in fraud); *Haynes v. Anderson*

*& Strudwick, Inc.*, 508 F. Supp. 1303, 1321 (E.D. Va. 1981) (("Scienter is not . . . an element of a claim under the Truth in Lending Act." (quoting 15 U.S.C. s 1640.)); *Vallies v. Sky Bank*, 583 F. Supp. 2d 687, 692 (W.D. Pa. 2008) ("TILA is not grounded in the protection against common law fraud."). Thus, the lower pleading standards set forth in Fed. R. Civ. P. 8(a) govern Plaintiff's TILA claim.

Courts across the country, and in this district, consistently hold that TILA claims do not sound in fraud and do not trigger 9(b)'s heightened pleading standard. *See, e.g., Maxwell v. Union Fidelity Mortg., Inc.*, No. 1:08–CV–001329 OWW SMS, 2009 WL 426189, *5 (E.D. Cal. Feb. 19, 2009) ("the law does not require that TILA claims be stated with particularity. A review of Ninth Circuit authority did not reveal any caselaw imposing the specificity requirements of Fed. R. Civ. P. 9(b) with respect to TILA claims."); *Levitan v. McCoy*, No. 00 C 5096, 2001 WL 1117279, *3-4 (N.D. Ill. Sept. 21, 2001) (TILA claim does not sound in fraud, negating Defendant's claim that 9(b) pleading standard should apply); *Staley v. Americorp Credit Corp.*, 164 F. Supp. 2d 578, 582-583 (D. Md. 2001) (TILA allegations of inaccurate disclosures relating to finance charge and average percentage rate were sufficient to state a claim for relief under general pleading standards); *Swanagan v. Al Piemonte Ford Sales, Inc.*, No. 94 C 4070, 1995 WL 493480, at *3-4 (N.D. Ill. Aug. 15, 1995) (finding TILA allegations sufficient to state a claim for relief under general 12(b)(6) pleading standards).

## CONCLUSION

Based on the foregoing, WCL respectfully requests that the Court deny loanDepot's Motion to Dismiss in all respects.

Dated: June 18, 2026

Respectfully submitted,

RYAN E. STEARNS, State Bar No. 165262
STEARNS & RYAN, LAWYERS
21250 Hawthorne Boulevard, Suite 310
Torrance, CA 90503
Phone:        (310) 793-9570
Fax:          (310) 793-9575
rstearns@stearnsandryan.com

Arielle Stephenson, State Bar No. 336434
Ellen R. Boyd, State Bar No. 339542
MITCHELL SANDLER PLLC
2020 K Street NW, Suite 760
Washington, D.C. 20006
202.886.5260
astephenson@mitchellsandler.com
eboyd@mitchellsandler.com

*Attorneys for Plaintiff West Capital Lending, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Plaintiff West Capital Lending, Inc., certifies that this brief contains 6,770 words, which complies with the word limit of L.R. 11-6.1.

Dated:       June 18, 2026      _____

Ryan E. Stearns

## PROOF OF SERVICE

**WEST CAPITAL LENDING, INC. v. LOANDEPOT.COM, LLC**
**8:26-cv-00522-JDE**

At the time of service, I was over 18 years of age and not a party to this action. My business address is 21250 Hawthorne Blvd., Suite 310, Torrance, California 90503.

On June 18, 2026, I served true copies of the following document described as PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on June 18, 2026, at Torrance, California.

_____
Rosi Plaschinski Saltzberg

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

- 33 -

## SERVICE LIST

### WEST CAPITAL LENDING, INC. v. LOANDEPOT.COM, LLC
### 8:26-cv-00522-JDE

COOLEY LLP
ALEXANDRA R. MAYHUGH
(amayhugh@cooley.com)
Two California Plaza
350 S. Grand Ave., Suite 3200
Los Angeles, CA 90071

MICHELLE L. ROGERS
(mrogers@cooley.com)
ELIAS S. KIM
(ekim@cooley.com)
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004

TYLER PRICE
(tprice@cooley.com)
55 Hudson Yards
New York, NY 10001